1          **UNITED STATES DISTRICT COURT**

2               **DISTRICT OF OREGON**

3                **PORTLAND DIVISION**

4  SHAWNA C. MITCHELL,                    )
                                           )
5                 Plaintiff,               )    No. 03:12-cv-01062-HU
                                           )
6  vs.                                     )
                                           )
7  CAROLYN W. COLVIN[1],                   )**FINDINGS & RECOMMENDATION**
   Commissioner of Social Security,        )
8                                          )
                  Defendant.               )
9
                   _____
10

11 Richard F. McGinty
   McGinty & Belcher, PC
12 P.O. Box 12806
   Salem, OR 97309
13
        Attorneys for Plaintiff
14

15 S. Amanda Marshall
   United States Attorney
16 Adrian L. Brown
   Assistant United States Attorney
17 1000 S.W. Third Avenue, Suite 600
   Portland, OR 97204-2904
18

19 David Morado
   Regional Chief Counsel, Region X, Seattle
20 Nancy A. Mishalanie
   Special Assistant United States Attorney
21 Office of the General Counsel
   Social Security Administration
22 701 Fifth Avenue, Suite #2900 M/S 901
   Seattle, WA  98104-7075
23
        Attorneys for Defendant
24

25

26
   _____
        [1]Carolyn W. Colvin became acting Commissioner of Social
27 Security on February 24, 2013.  Therefore, pursuant to Federal Rule
   of Civil Procedure 25(d), she is automatically substituted for
28 Michael J. Astrue as Defendant in this case.

1 - FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff Shawna C. Mitchell seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's final decision denying her applications for Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and Supplemental Security Income benefits under Title XVI of the Act. Mitchell argues the Administrative Law Judge ("ALJ") erred in failing to consider all of Mitchell's impairments; giving improper weight to "conflicted and ambiguous" medical expert testimony; failing to develop the record fully and fairly; and failing to include all of Mitchell's impairments in the ALJ's residual functional capacity ("RFC") assessment. *See* Dkt. ## 15 & 20.

## I.  PROCEDURAL BACKGROUND

Mitchell protectively filed her application for DI benefits on February 5, 2009, at age 40. She filed her application for SSI benefits on August 17, 2010, at age 41. In both applications, Mitchell claimed disability since September 2, 2008, due to a number of impairments including "Undifferentiated Connective Tissue Disease," "Auto-Immune System Disorder," "Systemic Lupus Erythematosus," "Systemic Sclerosis," "Raynaud's Phenomenon,[2]" "Carpal Tunnel [Syndrome]," "Migraine Headaches," "Chronic Fatigue Syndrome," "Depression," "Insomnia," "Adrenal Gland Fatigue," "Osteopenia,"

---

[2]Raynaud's Phenomenon is a condition that causes some areas of the body - for example, the hands and feet - to feel numb and cool in response to a "vasospastic attack" - the constriction of blood vessels and resulting reduced blood flow that occurs in reaction to cold temperatures or stress. *See* http://www.arthritis.org/conditions-treatments/disease-center/raynauds-phenomenon/ (visited 10/21/2013).

2 - FINDINGS & RECOMMENDATION

1  "Long Term High-Risk Medications," "Fibromyalgia," "Inflammatory
2  Arthritis," and "Cystic Malformation of the Posterior Fossa with a
3  'Mega Cisterna Magna.'" (A.R. 172-78; *see* A.R. 10, 159, 164[3])  In
4  a detailed narrative, Mitchell claims these impairments prevent her
5  from working due to constant joint and muscle pain; nausea and
6  fatigue; "anxiety, depression, moodiness and personality changes
7  that affect [her] ability to interact with co-workers well or
8  handle stress"; difficulty concentrating; disorientation; "brain
9  fog [and] mental slowness"; swelling in her hands and fingers;
10  "troublesome bowels"; numbness in her fingers; wrist pain; high
11  risk of fracture; and the need to avoid interactions with anyone
12  who might have "even a slight cold," due to her disrupted auto-
13  immune system.  (A.R. 172-75)

14     Mitchell's applications were denied initially and on recon-
15  sideration.  (A.R. 94-100, 105-08)  Mitchell requested a hearing
16  (A.R. 109-10), and a hearing was held on March 4, 2011, before an
17  ALJ.  Mitchell was represented by an attorney at the hearing.
18  Witnesses at the hearing included Mitchell, a Vocational Expert
19  ("VE"), and a Medical Expert ("ME").  (A.R. 26-93)  On April 8,
20  2011, the ALJ issued his decision, denying Mitchell's applications
21  for benefits.  (A.R. 7-20)  Mitchell appealed the ALJ's decision,

---

23
24     [3]The administrative record ("A.R.") was filed electronically
using the court's CM/ECF system.  Dkt. #12 and attachments.  Pages
25  of the A.R. contain at least three separate page numbers: two
located at the top of the page, consisting of the CM/ECF number
26  (e.g., Dkt. #12-10, Page 2 of 82) and a Page ID#; and a page number
located at the lower right corner of the page, representing the
27  numbering inserted by the Agency.  Some pages also contain a page
number inserted by the office supplying the records.  Citations
28  herein to "A.R." refer to the agency numbering in the lower right
corner of each page.

1  and on April 27, 2012, the Appeals Council denied her request for
2  review (A.R. 1-3), making the ALJ's decision the final decision of
3  the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.  Mitchell
4  filed a timely Complaint in this court seeking judicial review of
5  the Commissioner's final decision denying her applications for DI
6  and SSI benefits.  Dkt. #1.  The matter is fully briefed, and the
7  undersigned submits the following findings and recommended
8  disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.  FACTUAL BACKGROUND

### A.  Summary of the Medical Evidence

12      On November 2, 2006, Mitchell was seen for an occupational
13  therapy evaluation at Cascade Hand Therapy, Inc., related to
14  Mitchell's diagnosis of Raynaud's Phenomenon and carpal tunnel
15  syndrome.  Mitchell described her current symptoms as "pain, pre-
16  dominantly of the right hand and forearm[;] decreased sensitivity,
17  numbness and tingling in right greater than left hand and wrist";
18  and some other symptoms involving her fingers and toes.[4]  (A.R.
19  313)  Mitchell stated her pain was worse at night.  She had
20  stiffness in the morning that generally would take "two to four
21  hours of conscious effort and activity to 'get her right hand
22  going.'" (*Id.*)  She had tried various treatments without sustained
23  success.  Most recently, she had obtained relief of nerve pain from
24  the medication gabapentin, but she still had numbness and decreased
25  sensitivity.  An oral steroid had helped somewhat with swelling,

27      [4]The photocopy of the evaluation report that appears in the
28  administrative record is of poor quality, with portions that are
    difficult or impossible to read.  (*See* A.R. 313-14)

pain, and stiffness.   Notes indicate Mitchell had a recent diagnosis of "moderate to severe carpal tunnel symptom[s] bilaterally," and Mitchell was "undergoing additional medical testing to determine types of arthritic conditions." (*Id.*)

On examination, Mitchell's hands and fingers were swollen, with "some degree of 'block' shape of the fingers." (*Id.*) Her fingers were discolored a "purple-red," which notes indicate was "consistent with Raynaud's phenomenon." (*Id.*)   Her fingers remained neutral at rest, without evidence of contraction, defor-mity, or "trigger fingers."  Mitchell complained of tenderness on palpation of her right ring finger, and a "firm nodule" was palpated.  She also had "tenderness of the thumb [metacarpal] joint of [the] right hand." (*Id.*)  The evaluation took place in the mid-afternoon, and at that time, Mitchell had "full functional range of motion of digits, wrists, and upper extremities, although when observing her donning her jacket, she avoid[ed] shoulder abduction or forward flexion motions." (*Id.*)  She was observed to be "awk-ward and clumsy" when handling her purse and planner, with "diffi-culty in sustaining grasp of these items." (*Id.*)  Mitchell rated her pain as "strong to severe." (*Id.*)  She stated her ability to perform routine self-care activities was deteriorating, and she was "receiving assistance from family members, in particular[] her daughter." (A.R. 314)  She had the greatest difficulty performing tasks for the first several hours of the morning.   Mitchell reported that she could only "drink from a Dixie cup"; she developed pain in her right hand from writing; she tended to run out of strength; and she had "difficulty in handling the weight of her own clothes for dressing or towels for drying after bath time."

5 - FINDINGS & RECOMMENDATION

1  (*Id.*)  She stated she no longer was able to open bottles, cans, or
2  jars; push or pull a vacuum cleaner; prepare meals; or do grocery
3  shopping.  She had "attempted to remain employed in an office for
4  Cobe [sic] Beef of America."  (*Id.*)

5       Mitchell's treatment plan included home exercises, education
6  regarding adaptations of activities of daily living, and physical
7  therapy modalities.  Her treatment objectives were to "[d]ecrease
8  swelling and stiffness of right greater than left hand and wrist";
9  "[r]educe pain to 2/10 or better with routine activities of daily
10 living"; "regain functional bilateral pinch, minimum 10 pounds, and
11 35 to 50 pounds of grip"; and "demonstrate independence and/or use
12 of adaptive techniques and tools in performing routine self-care
13 activities."  (*Id.*)

14      On November 16, 2006, Mitchell saw naturopathic doctor (N.D.)
15 Laurie Grisez with complaints of pain, swelling, and weakness
16 throughout her body, and medication side effects.  She also com-
17 plained of poor sleep, fatigue, and a "pins and needles" sensation
18 in her right hand and forearm.  Mitchell stated she had been
19 diagnosed by a medical doctor with systemic sclerosis, systemic
20 lupus, and mixed connective tissue disease ("MCTD").  She had been
21 taking pain medications for two weeks with minimal improvement.
22 She also was experiencing gas, bloating, and diarrhea.  On exami-
23 nation, Mitchell exhibited diminished deep tendon reflexes, and
24 pain on palpation of her fingers.  Dr. Grisez assessed Mitchell
25 with Lupus and Scleroderma.  She prescribed homeopathic medica-
26 tions, and epsom salt baths.  (A.R. 316-17)

27      Mitchell saw Dr. Grisez for followup on November 28, 2006.
28 Mitchell reported continuing hand pain, and stated she was "having

6 - FINDINGS & RECOMMENDATION

exploratory surgery to rule out carpal tunnel." (A.R. 321) She
stated her pain medication was making her nauseous. The doctor
discontinued certain herbal medications she felt were interfering
with Mitchell's prescription medications, and started Mitchell on
other herbal and homeopathic remedies. (*Id.*)

On August 31, 2007, Mitchell saw neurologist Craigan Griffin,
M.D. for followup of carpal tunnel syndrome, right more than left;
right-sided upper extremity numbness; upper extremities pain;
chronic daily headache; history of depression; and "migraine
variants, [with] intractable migraine." (A.R. 393) Mitchell was
taking Neurontin (gabapentin) for her right upper extremity pain.
Because Neurontin made her drowsy, she had tried Lyrica for awhile,
but when it did not provide good pain control, she resumed taking
the Neurontin. Regarding her headaches, Mitchell complained of
"mild headaches for 5 days a week, or moderate headaches about 3
days a week which responded to Tylenol extra strength, and . . .
more severe headaches which last for several days occurring once or
twice a month, which will break with a half a tab of Vicodin."
(A.R. 393-94) Mitchell complained of increasing fatigue and day-
time sleepiness. She also complained of "some difficulty with word
finding." (A.R. 394) The doctor indicated Mitchell's daytime
sleepiness and word finding difficulty were likely side effects of
the Neurontin. He continued Mitchell on Neurontin 300 mg., up to
five tablets daily, "anticipating an eventual taper." (A.R. 395)
He started Mitchell on nortriptyline 10 mg. nightly for headache
prophylaxis, with a gradual increase up to 40 or 50 mg. nightly.
(*Id.*)

7 - FINDINGS & RECOMMENDATION

1    Mitchell saw Dr. Griffin for followup on October 12, 2007.
2  Due to the side effects, Mitchell had reduced her Neurontin to 300
3  mg. three time daily; however, her pain was increasing.  Mitchell
4  reported that her rheumatologist was attempting to reduce
5  Mitchell's prednisone by prescribing methotrexate, but Mitchell
6  also was having increased pain with the lower prednisone dosage.
7  (A.R. 397) The morning of this appointment, Mitchell had awakened
8  with a severe migraine that had not responded to Tylenol, Vicodin,
9  or Percocet. Dr. Griffin recommended a trial of Maxalt, with
10 Mitchell to "call for DHE infusion if no effect." (A.R. 399)  The
11 doctor advised Mitchell to increase her nortriptyline dosage to
12 50 mg. at night, and try reducing her Neurontin "by one tab weekly
13 until off, to see if this does not improve the side effects."
14 (*Id.*)  He also indicated Mitchell could increase the nortriptyline
15 dosage further, if needed, to as much as 100-150 mg. per night.
16 (*Id.*)

17    On October 16, 2007, Mitchell saw Rheumatologist Larry T.
18 Balentine, M.D., for followup of rheumatoid arthritis, MCTD,
19 Raynaud's phenomenon, and continued monitoring of long-term,
20 chronic, high-risk medications. Mitchell complained of nausea from
21 methotrexate[5].  Her MCTD and Raynaud's symptoms were improved, and
22 she had no significant inflammatory arthritis symptoms currently.

23

24    [5]Among other things, methotrexate is used to manage "severe,
25 active, rheumatoid arthritis."  Drug warnings indicate the drug
   should be used only in patients with rheumatoid arthritis which is
26 "severe, recalcitrant, disabling . . . [and] not adequately
   responsive to other forms of therapy," due to the possibility of
27 serious, sometimes fatal, toxic reactions.  *See* www.rxlist.com/
   trexall- drug.htm (visited 11/01/2013) (Trexall is one of the brand
28 names for methotrexate).

8 - FINDINGS & RECOMMENDATION

1  On examination, Mitchell weighed about 140 pounds (63.7 kg), and
2  her blood pressure was 118/70.  She had "a raised erythematous
3  nonpalpable rash involving multiple areas of her body - chest,
4  arms, and legs," without ulcerations of nodules.  (A.R. 352)  She
5  was directed to continue her current dose of methotrexate and folic
6  acid, but to add leucovorin[6] the day after she took the metho-
7  trexate and not take folic acid that day.  The doctor hoped this
8  would improve Mitchell's nausea.  Mitchell also complained of "pain
9  cycling every 3 weeks," in connection with her rash, and reduced
10 sex drive for several months.  (*Id.*)  She was referred to Derma-
11 tologist James M. Hoesly, M.D. at Bend Memorial Clinic for
12 evaluation and biopsy of her skin rash.  Dr. Balentine indicated he
13 would not rule out "the possibility of hypersensitivity vasculitis
14 from topical steroids," although he doubted Mitchell's painful rash
15 was medication related. (*Id.*)

16     Mitchell returned to see Dr. Griffin on November 2, 2007.
17 Mitchell reported good response to the nortriptyline.  However, she
18 had developed "severe night sweats, bad dreams, photosensitivity
19 with rash, and decreased libido."  (A.R. 402)  The doctor opined
20 these were side effects from the nortriptyline.  Although he wanted
21 to increase the dosage further to address Mitchell's "jabs and
22 jolts" headaches, he directed her to continue at the current dosage
23 for another three to four weeks to see if the side effects would

24

25

26

27     [6]"Leucovorin calcium tablets are indicated to diminish the
toxicity and counteract the effects of impaired methotrexate
28 elimination. . . ."  www.rxlist.com/leucovorin-drug/indications-
dosage.htm (visited 11/01/2013).

9 - FINDINGS & RECOMMENDATION

1  improve.  (A.R. 403-04)  He recommended a trial of melatonin for
2  insomnia.  (A.R. 404)

3      Mitchell saw Dr. Griffin for followup on November 30, 2007.
4  Mitchell reported fairly good headache control with the nortrip-
5  tyline, although she had had one "breakthrough migraine" that did
6  not respond to Maxalt, but did respond to Vicodin.  She was
7  experiencing increased fatigue, which she noted was a pattern for
8  her - three to four weeks of feeling better and more energetic,
9  followed by a period of feeling more fatigued and uncomfortable.
10 The doctor recommended discontinuing Neurontin in the morning to
11 see if this helped Mitchell's energy level.  He also ordered a
12 check of her vitamin B12 level.  He noted Mitchell's insomnia was
13 well controlled with melatonin.  (A.R. 407-08)

14     Mitchell was seen in an urgent care clinic on January 29,
15 2008, complaining of a migraine headache.  She was treated with an
16 injection of Imitrex, Stadol, and Phenergan, and was sent home with
17 directions to rest in a cool, dark room; take Maxalt at first sign
18 of a migraine; carry her medication with her; and stop taking
19 Tylenol.  She also was directed to follow up with Dr. Griffin.
20 (A.R. 327-30)

21     On February 22, 2008, Mitchell saw Dr. Griffin for followup.
22 Mitchell stated the nortriptyline helped her sleep, but did not
23 appear to have decreased her headaches.  Maxalt was only working
24 about 50% of the time, and made her groggy.  She wondered if she
25 might try Imitrex instead of the Maxalt.  Dr. Griffin agreed to a
26 trial of Imitrex with Vicodin for backup, and continuing the
27 nortriptyline at night.  He added prochlorperazine to maximize the
28 effect of the Imitrex.  He also recommended a trial of acupuncture

10 - FINDINGS & RECOMMENDATION

in an attempt to reduce Mitchell's medication requirements.  He
noted labs had indicated a vitamin B12 deficiency, so Mitchell had
begun receiving monthly B12 injections, which were improving her
memory and energy.  He continued Mitchell's melatonin dosage for
insomnia.  (A.R. 413-14)

Mitchell saw a doctor at an urgent care clinic on April 1,
2008, complaining of a severe migraine with photophobia.  She
reported her current medications as Vicodin, Flexeril, and Tylenol.
She had taken two doses of Imitrex without relief.  Mitchell was
noted to be tearful.  She was treated with an injection of Stadol
and Phenergan, and was directed to drink lots of fluids, and rest
in a cool, dark room.  She also was given a prescription for
Phenergan.  (A.R. 325-27)

On October 16, 2008, Mitchell saw chiropractor Coby L. Hanes,
D.C. with complaints of stiffness and soreness in her left hip.
Mitchell had decreased range of motion of her entire spine and
right SI joint.  She was treated with chiropractic adjustments.
(A.R. 333-34)

Mitchell saw Dr. Griffin for followup on November 11, 2008.
Mitchell stated her headaches had "improved with a combination of
naturopathic remedies and acupuncture," but the headaches had
increased in frequency and intensity over the past two weeks.
(A.R. 417)  Mitchell had continued with the monthly vitamin B12
injections.  She reported "increasing difficulty with memory, con-
centration, multitasking, [and] word finding[.]" (*Id.*)  Mitchell
stated her employer had down-sized, and she was one of the
employees who was released.  She stated that "[w]ith her memory[]
difficulty, she [was] not sure that she would perform well with job

11 - FINDINGS & RECOMMENDATION

retraining." (*Id.*)  Dr. Griffin directed Mitchell to focus on headache prophylaxis with nortriptyline 50 mg. at night, reserving Imitrex and Vicodin for breakthrough migraines.  The doctor administered "a Mini-Mental status exam" on which Mitchell scored 27 out of 30, demonstrating difficulty primarily with orientation of time, place, and recall, as well as multi-tasking and concentration.  He directed Mitchell to continue with the monthly vitamin B12 injections.  He also prescribed a speech therapy evaluation and treatment to assist with the memory loss.  (A.R. 419-20)

On November 20, 2008, Mitchell saw Rheumatologist Irina Raklyar, M.D. for followup of her MCTD, Raynaud's disease, heart palpitations, and a urinary tract infection, as well as continued monitoring of Mitchell's long-term use of high risk medications. (A.R. 347-51)  Mitchell complained of fatigue; active Raynaud's symptoms, especially with the cooler weather; some thinning of her hair and a coarser texture; "some thigh weakness when hiking or walking for prolonged periods"; wrist pain; "brain fog and difficulty thinking sometimes" (noting she was scheduled for neurocognitive testing through her neurologist); "palpitations which occur spontaneously, not related to stress or emotion, though often . . . occur[ring] as she is trying to fall asleep"; and urinary tract infection symptoms.  (A.R. 348)  Mitchell was noted to be 5'6" tall, with a blood pressure of 120/80.  Notes indicate she "refused" to be weighed.  (A.R. 349)

On examination, Mitchell exhibited good ranges of motion and strength, with somewhat reduced deep tendon reflexes.  The doctor found no overt evidence of activity related to Mitchell's MCTD, but she indicated Mitchell's "complaints of fatigue and leg weakness,

12 - FINDINGS & RECOMMENDATION

despite good strength on clinical exam, may suggest subtle myopathy with exertion or subclinical respiratory dysfunction." (A.R. 347) The doctor planned to assess Mitchell's respiratory status and investigate for pulmonary hypertension with x-rays, pulmonary function test, and an echocardiogram.  She also referred Mitchell to physical therapy for "conditioning." (*Id.*)  Dr. Raklyar opined Mitchell's "mental slowness [was] from the combination of [central nervous system] meds she [was] taking (Neurontin, Wellbutrin, nortryptilline [sic], additional migraine meds as needed)[.]" (*Id.*)   She advised Mitchell to discuss her symptoms with her neurologist.  (*Id.*)

Mitchell received an injection for the urinary tract infec-tion.  Current medications that were continued without change included leucovorin, prednisone, methotrexate, folic acid, Neurontin (a brand name for gabapentin, used to treat neuropathy); vitamin B, vitamin C, and a multivitamin; Wellbutrin XL (an anti-depressant); Flexeril (a muscle relaxant); Vicodin (hydrocodone) for pain, as needed; nortriptyline (another anti-depressant); Imitrex (for migraines); Compazine after a migraine (brand name for prochlorperazine, used to control severe nausea and vomiting, as well as to treat non-psychotic anxiety); Treximet (brand name for sumatriptan and naproxen sodium, used for acute treatment of migraine attacks); and Maxalt (brand name for rizatriptan benzoate, used for the acute treatment of migraines)[7].  (A.R. 347-49)  The doctor added a calcium and vitamin D combination tablet, increasing

---

[7]Except where noted otherwise, medication information was taken from www.rxlist.com (visited 11/01/2013).

Mitchell's vitamin D dosage, and also added Plaquenil[8].   She
administered a pneumonia vaccination, and changed Mitchell's dosage
of nifedipine (used to treat angina).

Mitchell underwent a bone density study on December 5, 2008,
due to her ongoing use of Prednisone.   The test showed the presence
of osteopenia (reduced bone mineral density).   (A.R. 380-81)

On December 8, 2008, Mitchell underwent a transthoracic
echocardiogram to evaluate her heart palpitations.   The study was
essentially normal.   (A.R. 367-68)   A CT examination of Mitchell's
heart also was normal, indicating "[n]o active cardiopulmonary
disease."   (A.R. 379)   A comprehensive pulmonary function test
performed on December 11, 2008, also was normal.   (A.R. 370-78)

Mitchell saw Dr. Griffin for followup on December 15, 2008.
Her headaches had increased in frequency, and typically were
occurring around 1:00 to 2:00 a.m.   She also reported increased
myalgias and arthralgias, forearm cramping pain, and numbness in
her hands, especially at night.   Mitchell was directed to continue
taking 50 mg. of nortriptyline at night, using Darvocet for
breakthrough migraines, but limiting the Darvocet to one or two
days per week.   The doctor noted a nerve conduction study might be
indicated if Mitchell's hand numbness persisted.   (A.R. 423-24)

On February 3, 2009, Mitchell saw Dr. Raklyar for followup.
(A.R. 343-46)   Mitchell indicated her Raynaud's symptoms had
improved, but she complained of fatigue and joint pains in her

---

[8]Plaquenil is a brand name for hydroxychloroquine sulfate,
used to treat patients with lupus erythematosus and rheumatoid
arthritis "who have not responded satisfactorily to drugs with less
potential for serious side effects[.]" www.rxlist.com/plaquenil-
drug/indications-dosage.htm (visited 11/01/2013).

14 - FINDINGS & RECOMMENDATION

wrists and forearms, and pain throughout her body, especially in her thighs.  Her pain was worse at bedtime, and she had poor sleep, occasional night sweats, weight gain, palpitations, dysuria, and "brain fog."  (A.R. 343-44)  Mitchell became tearful when discussing her symptoms.  On examination, she again refused to be weighed.  (A.R. 345)  She exhibited normal ranges of motion and motor strength throughout.  She exhibited bilateral tenderness in her wrists, knees, ankles, and feet, and 18 of 18 fibromyalgia tender points.  Notes indicate the doctor believed most of Mitchell's pain symptoms were from fibromyalgia.  (A.R. 343-45) She noted Mitchell had increased her prednisone dosage on her own, and the doctor directed her not to do so without calling the doctor first.  The doctor started Mitchell on tramadol for pain; decreased the prednisone dosage; and continued Mitchell on her other medications.  Dr. Raklyar indicated Mitchell was "temporarily disabled," and should initiate treatment for fibromyalgia.  (A.R. 346)

Dr. Raklyar referred Mitchell to Physical Medicine and Rehabilitation specialist Larry E. Paulson, M.D. for evaluation of Mitchell's ongoing diffuse pain.  Dr. Paulson conducted the evaluation on February 9, 2009.  He recorded the following history of Mitchell's present illness:

> Shawna Mitchell is a 40-year-old female who has . . . diagnoses of mixed connective tissue disease including systemic lupus, polymyositis, Raynaud's disease, fibromyalgia, and migraine headaches.  The patient has pain throughout her entire body from her head down to her toes both anteriorly and posteriorly. Pain is primarily described as an aching sensation an 8/10 in intensity.  She also complains of weakness, fatigue, and decreased endurance.  It is unclear what aggravates her pain.  Her pain is better with Vicodin, tramadol, and also with horse back riding.

15 - FINDINGS & RECOMMENDATION

(A.R. 383)  Mitchell stated she had tried amitriptyline, Lyrica, Cymbalta, and a TENS unit, none of which had been helpful. Mitchell stated she found physical therapy to be a "waste of time," and she avoided swimming because the cold water triggered her Raynaud's symptoms.  She was seeing an acupuncturist monthly, and received chiropractic adjustments and massage every couple of weeks, and she found these to be somewhat helpful.  She reported taking about eight Vicodin tablets per month when she had a significant migraine, but she noted it also helped her diffuse body pain.  Wellbutrin was effective for her depression, and Neurontin was helping her arm and hand pain "a significant amount."  (*Id.*) She also was taking Flexeril, nortriptyline, Ultram, melatonin, and Tylenol PM.  (*Id.*)

Mitchell stated she required assistance with some of her basic activities of daily living at times, but not always.  Her daughter helped her with grocery shopping by pushing the cart, and loading and unloading the groceries.  Mitchell sometimes was able to do dishes and laundry, and she sometimes could "walk less than 1 mile on a treadmill," but she reported decreased endurance with all of her activities of daily living.  (*Id.*)

Notes indicate Mitchell's blood pressure was 110/72, and her pulse 72.  On examination, Dr. Paulson found Mitchell did not "have typical fibromyalgia tender points."  (A.R. 384)  She had "some trigger points in the levator scapulae, and upper trapezius bilaterally, but they really are not painful to palpation."  (*Id.*) Mitchell exhibited "functional range of motion of the neck and she move[d] very quickly, and [had] no pain with any of these maneuvers."  (*Id.*)  She also had "functional range of motion of her

16 - FINDINGS & RECOMMENDATION

lumbar spine without any pain," and "no obvious muscle spasm."
(*Id.*)  She had ful strength in upper and lower extremities, intact
coordination and reflexes, and normal gait.  (A.R. 384-85)
Dr. Paulson reviewed an MRI study of Mitchell's brain which showed
"a probable arachnoid cyst that was unchanged from 2006 MRI."
(A.R. 385)  The doctor's assessment of Mitchell was (1) "Entire
diffuse body pain with a probable fibromyalgia as well as mixed
connective tissue disease, systemic lupus, systemic sclerosis,
Raynaud's phenomenon, and reported polymyositis"; and (2) Possible
mild bilateral carpal tunnel syndrome." (*Id.*)

Dr. Paulson indicated Mitchell's condition seemed to be
reasonably controlled by her current medications.  He noted some
concern due to the "risk of seizure with the patient using Ultram
mixed with nortriptyline and Flexeril." (*Id.*)  He indicated an
aerobic exercise program would be the safest treatment to improve
Mitchell's quality of sleep. He also suggested a possible trial of
discontinuing the nortriptyline and trying desipramine; however, he
again noted that because Mitchell's migraines seemed to be under
good control, he could not really recommend any medication change.
He advised Mitchell to "continue with her acupuncture[,] massage
and chiropractic care," and "encouraged her to continue riding
horses as this has helped her pain and most likely has helped her
mood also." (*Id.*)  He recommended she continue walking on a
treadmill, slowly increasing her time to build up strength and
endurance. (*Id.*)

On February 13, 2009, Mitchell saw Family Practice specialist
Mary S. Fan, M.D. for evaluation of heart palpitations. Mitchell
self-reported her weight at 130-135 pounds.  She reported having

17 - FINDINGS & RECOMMENDATION

palpitations for about a year, running in cycles where she would have them frequently for several days and then none for several days. Notes indicate an echocardiogram and EKG had been negative, and Mitchell's annual chest x-rays (done in connection with her MCTD) had been negative. Mitchell stated she drank one cup of coffee daily, minimal alcohol, and no energy drinks or herbs. Dr. Fan advised Mitchell to discontinue all caffeine. She recommended a 24-hour Holter monitor, with followup after the Holter. (A.R. 390)

Mitchell returned to see Dr. Griffin on February 27, 2009. Notes indicate a rheumatologist had diagnosed Mitchell "with fibromyalgia and osteopeania [sic] as well as an inflammatory arthritis." (A.R. 426) Mitchell's headaches were moderately controlled on her current medications. She was wearing wrist splints that helped reduced her wrist pain, but she continued to complain of numbness in her hands and fingers that worsened with activity. A nerve conduction study did not indicate any median nerve injury at the wrist or other nerve injury to explain Mitchell's symptoms. In fact, the study showed improvement from a 2006 nerve conduction study. The doctor directed Mitchell to continue using the wrist splints for symptomatic relief. He also suggested there might be a vascular cause for Mitchell's paresthesias, and he directed her to follow up with Dr. Raklyar for further testing and treatment. (A.R. 430; see A.R. 433)

On May 28, 2009, Physical Medicine and Rehabilitation specialist Linda L. Jensen, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form regarding Mitchell. (A.R. 447-54) She opined Mitchell would be able to

18 - FINDINGS & RECOMMENDATION

lift/carry up to 20 pounds occasionally and 10 pounds frequently; sit, and stand/walk, for about six hours each in an eight-hour workday; and push/pull without limitation. She indicated Mitchell would be able to perform frequent, but "not constant," fine manipulation with her fingers. She recommended Mitchell avoid concentrated exposure to extreme cold, and to hazards. (*Id.*) Dr. Jensen gave no weight to Dr. Raklyar's February 2009 opinion that Mitchell was temporarily disabled, noting that opinion was "not stated in functional terms and . . . not supported by the objective findings in file." (A.R. 454) She noted Mitchell's activities include horseback riding and hiking, and Mitchell had been encouraged to begin a treadmill walking program. Dr. Jensen found these activities to be consistent with her RFC assessment. (A.R. 452)

On May 29, 2009, psychologist Dorothy Anderson, Ph.D. reviewed the record and completed a Psychiatric Review Technique form regarding Mitchell. (A.R. 455-68) Dr. Anderson found Mitchell's depression would cause only mild limitations in Mitchell's activities of daily living, social functioning, and cognitive abilities, and therefore, her depression is not a severe impairment. (*Id.*) The doctor indicated that "[d]espite notes of depression and memory loss, the noted overall level of function in file best supports a non-severe [rating]." (A.R. 467)

On July 20, 2009, Mitchell returned to see her chiropractor, Dr. Hanes. Mitchell complained of pain and stiffness in her cervical and thoracic spine. She was treated with massage. (A.R. 473-74)

19 - FINDINGS & RECOMMENDATION

1    On August 28, 2009, Mitchell's pelvis was x-rayed to evaluate
2  her complaint of right-sided low back pain.  The study showed minor
3  degenerative change of the SI joints, slightly greater on the
4  right, and "[s]uspected narrowing of the L4-5 disc space with
5  slight levoscoliosis." (A.R. 493)

6    On September 10, 2009, Mitchell was seen in the emergency room
7  complaining of "severe right upper quadrant pain." (A.R. 481)
8  Mitchell stated she had been helping a neighbor prepare for a
9  garage sale.  She "was bending and twisting and lifting objects
10 that were not very heavy when she had sudden onset of acute 10/10
11 right upper quadrant abdominal pain, . . . worsened by movement,"
12 with no other symptoms. (*Id.*)  She was treated with IV pain and
13 anti-nausea medications, and was observed in the E.R. for a
14 prolonged period of time.  CT scans and lab reports all were
15 negative, which appeared to reassure Mitchell somewhat.  She was
16 discharged home without further treatment. (*See* A.R. 481-93)

17   On November 5, 2009, Mitchell saw Dr. Paulson for followup of
18 her pain management.  Mitchell stated her headaches were under good
19 control.  Her widespread body aches were worse when standing and
20 walking, and better with horseback riding and Vicodin.  She was
21 taking Vicodin a couple of times a week.  Dr. Paulson directed
22 Mitchell to taper off of Ultram.  He indicated she could take up to
23 five Vicodin tablets per day. (A.R. 514-15)  He ordered an EMG "to
24 evaluate for a flareup of her polymyositis versus a steroid
25 myopathy." (A.R. 516)

26   Mitchell saw Dr. Griffin for followup on February 2, 2010.
27 Mitchell continued to have "global headaches, without a particular
28 trigger, aggravating, or alleviating factors and without ongoing

20 - FINDINGS & RECOMMENDATION

nausea, with some degree of sensitivity to light and sound when most severe." (A.R. 498)  She was taking Vicodin as needed for breakthrough headaches.  She had transitioned from Neurontin to Lyrica, and from Ultram to Vicodin.  In addition, her rheuma-tologist had increased Mitchell's prednisone dosage.  She continued to have diffuse pain and weakness, without sensory loss or new paresthesias.  Dr. Griffin noted that Mitchell's past MRI studies from February 2006, and August 2007, had shown "evidence for an occipital lobe arachnoid cyst," but the doctor believed the cyst likely was "incidental," and not a cause of Mitchell's headaches. (A.R. 498, 501)  He recommended tapering Mitchell off all opiates to determine if she was having medication rebound headaches.  He continued Mitchell on the Lyrica for headache prophylaxis.  (A.R. 501)  Regarding Mitchell's diffuse weakness and pain, the doctor noted these symptoms were "certainly unusual in that there is no clear underlying etiology despite extensive evaluation and even empiric treatment.  Evaluation on neurologic exam does not show evidence for peripheral sensory neuropathy, motor neuropathy, myopathy, [myelopathy,] or neuromuscular junction disease." (*Id.*) He recommended further rheumatologic and neuromuscular evaluation. He also noted the increased prednisone had not helped Mitchell's pain significantly, and her pain seemed to be her major symptom, "with resultant generalized deconditioning." (*Id.*)

Dr. Griffin indicated he could not determine Mitchell's disa-bility status until after further evaluations.  He noted further:

> On my evaluation today, the weakness is cer-
> tainly variable, and with the most prominent
> symptom being pain, she is clearly reluctant
> to move her extremities, particularly against
> resistance.  If no specific etiology [is]

21 - FINDINGS & RECOMMENDATION

1    found, disability status may need to be based
2    on her pain syndrome.  Her slowed cognitive
     processing is likely a side effect of the
     Vicodin; the MRI certainly does not show
3    atrophy.

4  (*Id.*)

5      Mitchell saw Dr. Fan on February 3, 2010, for a refill of her

6  buproprion.  She was taking 450 mg. daily, and although the

7  medication helped her depression somewhat, she continued to "have

8  bad days where she is tearful." (A.R. 525)  Mitchell also com-

9  plained of poor sleep, low energy level, irritability, and cogni-

10 tive difficulties.  On examination, Mitchell appeared fatigued, but

11 did not "demonstrate any difficulty with cognitive functioning."

12 (*Id.*)  Mitchell was continued on the buproprion without change.

13 (A.R. 525)

14     Mitchell saw Dr. Paulson on March 25, 2010, for followup of

15 her pain management.  Mitchell reported ongoing widespread pain, as

16 well as weakness, fatigue, and decreased endurance.  She was

17 getting some relief from tramadol and Vicodin.  Mitchell stated she

18 was taking one to four Vicodin per day to control her headaches.

19 The doctor indicated Mitchell could take up to six pills per day,

20 if necessary, and he had Mitchell sign a pain contract.  He

21 directed Mitchell to perform aerobic activities followed by range

22 of motion exercise to help her diffuse muscle pain.  (A.R. 511-13)

23     Mitchell saw Dr. Griffin on May 17, 2010, for followup.  She

24 continued to complain of headaches, memory loss, and generalized

25 weakness, especially on her right side.  Her headaches had evolved

26 into chronic, daily headaches.  The doctor opined these headaches

27 were "related to a combination of her poor sleep, lack of exercise,

28 diffuse pain, [and] doses of steroid and opiate therapy." (A.R.

22 - FINDINGS & RECOMMENDATION

506)  He did not expect any improvement in these headaches unless Mitchell could return to a "regular sleep cycle, regular meals, [plenty] of fluids, daily exercise, and elimination of opiate therapy."  (*Id.*)  He noted Mitchell's migraine headaches now were rare, and they responded well to Treximet; however, the medication was expensive and difficult for Mitchell to afford.  Dr. Griffin indicated Mitchell's generalized weakness did not appear to have any neurologic cause, and he deferred treatment for weakness to Mitchell's rheumatologist.  (*Id.*)

Regarding Mitchell's concentration difficulty and mental health, the doctor noted the following:

> The patient's affect is clearly blunted today compared to prior visits, and while part of this may be the burden of chronic disease, I am concerned also about the burden of medications she is taking.  I will defer to rheumatology, but certainly would be okay with a taper off Lyrica.  I did recommend she consider spending 1-2 hours per week volunteering her time as a respite from her focus on her health concerns.

(*Id.*)  He indicated Mitchell's only neurologic disease appeared to be her headaches, and there was little he could offer her in the way of treatment that Mitchell had not already tried.  (*Id.*)

On May 27, 2010, Mitchell returned to see Dr. Paulson for followup of pain management.  Dr. Paulson "had a long discussion with [Mitchell] about the pros and cons of using opioid medications."  (A.R. 510)  He refilled her hydrocodone prescription, noting he might put Mitchell back on tramadol or a possible opioid rotation in the future.

Mitchell also saw Dr. Fan on May 27, 2010, for a routine annual gynecological exam.  At this time, Mitchell weighed 124

1  pounds.  Mitchell complained of worsening depression.  She had been
2  taking buproprion 450 mg. daily for about nine months, but stated
3  she was "still quite tearful, irritable, [and] easily upset."
4  (A.R. 521)  Mitchell had begun seeing a counselor recently, and was
5  scheduled to see her every two weeks.  Dr. Fan directed Mitchell to
6  taper off the buproprion, and start citalopram (a different antide-
7  pressant).  She also encouraged Mitchell to exercise as much as
8  possible, and continue seeing her counselor.  (A.R. 521-24)
9
10           **B.  *Mitchell's Testimony***
11  **1.  *Hearing testimony***

12     Mitchell stated she was "either 42 or 43" years old at the
13  time of the hearing; she was not sure which.  (A.R. 61)  She is a
14  high school graduate, and has a valid driver's license.  (A.R. 62)

15     Mitchell stated her physical ailments include systemic lupus
16  erythematosus, fibromyalgia, a mixed connective tissue disorder,
17  and myofascial pain syndrome.  She stated she is unable to stand
18  for very long because her leg muscles are "so weak, . . . they feel
19  like . . . jello."  (A.R. 34)  She estimated she can only stand for
20  about ten minutes at a time, and she often needs to lean on
21  something, such as a countertop or a cane.  Her rheumatologist
22  prescribed a cane for her, and Mitchell uses the cane a couple of
23  times a week.  (A.R. 35-36)

24     She also has trouble sitting due to pain, and estimated she
25  can only sit for 15 to 30 minutes before she will have to get up
26  and change positions.  (A.R. 36-37)  She takes three to four naps
27  daily, ranging from one to three hours each.  She does very little
28  lifting due to weakness in her arms.  She can lift a gallon of milk

24 - FINDINGS & RECOMMENDATION

if she uses both hands.  She tries to fold laundry on occasion,
keeping her elbows next to her body and holding her forearms out at
a ninety-degree angle, but at times, she is so weak that she even
has trouble folding a T-shirt.  (A.R. 37-38)  She is too weak to
stand long enough to take a shower, so her rheumatologist pre-
scribed "a chair thing" for her to use in the shower.  (A.R. 62)

Mitchell also has trouble with personal care tasks such as
brushing her hair and brushing her teeth.  When she brushes her
hair, her fingers "go numb," and she has to lower her arms until
sensation returns to her fingers before she can finish.  (A.R. 39)
She has diagnoses of Raynaud's syndrome and carpal tunnel syndrome,
both of which affect her hands.  She has problems with numbness in
her hands every day, and this causes her to drop things.  She only
uses plastic bottles or glasses for drinking because she has
dropped and broken so many glass containers.  (A.R. 39-40)  She has
difficulty grasping objects, such as a shampoo bottle.  She can
hold a pencil briefly, but typing and writing both cause her
fingers to go numb.  She indicated the documents related to her
disability applications were typed for her by a friend.  (A.R. 40-
41)  Mitchell stated her Raynaud's disease causes her hands to
become numb and "turn white or purple."  (A.R. 61)  She has the
numbness and discoloration in her hands every day.  (*Id.*)  She also
has pain and weakness in her wrists at times, and she wears wrist
braces a few days a week that help with pain in her wrists.  (A.R.
62-63)

Mitchell stated the frequency of her migraine headaches
varies, but she typically has at least one migraine a week.  When
she gets a migraine, she has to take medication and lie down.

25 - FINDINGS & RECOMMENDATION

(A.R. 42)  She takes five different medications for her headaches.
She stated the medications make her feel "really tired," and she
has problems with mental confusion.  Mitchell stated her daughter
"thinks most of the time" for her, reminding her of things, writing
things down for her, and telling her where she needs to go and what
she needs to do.  When Mitchell tries to read, she has trouble with
comprehension and retention.  Her fatigue is present nearly all of
the time.  She has general weakness throughout her body, and gets
tired just walking from one room to another.  (A.R. 43-46)  She
stated her doctor wants her to walk, but just walking around the
outside of her house for five or ten minutes makes her so tired,
she has to go in an rest for about 20 minutes.  (A.R. 46)

Mitchell stated she has good days and bad days.  Her attorney
noted the record indicates that on occasion, Mitchell has done
activities that would appear to be inconsistent with disability.
For example, he noted the record indicates Mitchell helped a friend
set up for a garage sale, and she was "doing a lot of bending and
twisting and lifting light objects."  (A.R. 57)  Mitchell stated
she actually was sitting in a chair the whole time, and she would
lean down and help her friend go through some bags.  (*Id.*)  The
record also indicates Mitchell has engaged in horseback riding.
She stated this consisted of a fifteen-minute ride at a physical
therapy clinic called Healing Reins, and she had engaged in the
activity "a couple times a year."  (A.R. 57-58)  She stated her
doctor has encouraged her to walk on a treadmill or take walks
outdoors, but she has found these activities to be extremely
tiring.  (A.R. 58-59)

26 - FINDINGS & RECOMMENDATION

Mitchell lives in a manufactured home.  There are a couple of steps leading into the home, but there is a handrail she can use. Her 16-year-old daughter lives with her and does all of the household chores.  She also gets some help from her neighbors. While her daughter is at school, Mitchell watches television, and sometimes tries to go outside and walk.  She might put a few dishes in the dishwasher, if necessary.  (A.R. 59-60)

**2.   *Written testimony***

On March 20, 2009, Mitchell completed a Function Report - Adult.  (A.R. 256-66)  She indicated she was living in a mobile home with her 13½-year-old daughter.  Mitchell stated her daughter takes care of her on a daily basis.  They have two cats, and her daughter does all of the care-taking for the cats.  (A.R. 256-57)

Mitchell indicated that prior to the onset of her illnesses, she used to enjoy jogging, working out at a gym, riding bicycles, downhill skiing, water skiing, dancing, shopping, driving a stick shift, playing volleyball and basketball, and full-time work.  She no longer is able to participate in these activities.  Her daughter cuts Mitchell's meat into small bites for her.  Mitchell has to sit on a shower chair due to fatigue.  Her medications have caused her hair to thin and fall out, caused her to have diarrhea frequently, and leave her feeling fatigued.  She only sleeps well about two nights out of every seven, which leaves her moody and irritable. She experiences severe migraine headaches and heart palpitations, and Raynaud's syndrome causes her fingers to become numb if she holds her hands in any upright position.  (A.R. 257)

Mitchell's daughter does most of the cooking, sometimes with Mitchell's assistance.  Mitchell can make herself a sandwich or heat up a bowl of soup.  She indicated she and her daughter eat easy-to-prepare meals like Hamburger Helper and canned foods. (A.R. 258)  Mitchell does some of the light housework such as putting dishes in the dishwasher, dusting, laundry, and sweeping the kitchen floor, but these tasks take her quite a bit of time, and she takes frequent breaks.  (A.R. 258)  She is able to drive. Her daughter helps her shop for groceries and household items by pushing the cart, placing items in the cart, moving items onto the checkout stand, unloading bags from the car, and putting the groceries away.  Mitchell stated they walk slowly in the store, as she is not able to "zip in and out" like she used to.  (A.R. 259) Mitchell is able to handle money and pay bills, but it takes her twice as long as it did before she became ill because she has difficulty concentrating.  (A.R. 259-60)

Mitchell attached a lengthy narrative describing her daily activities and functional abilities.  She discussed her difficulties with caring for herself due to fatigue, numbness in her fingers, and depression.  Her concentration difficulties and fatigue also severely limit her ability to do things around te house.  She has approximately two doctors' appointments per week, and these leave her so fatigued, she has to lie down when she gets home.  She naps nearly every day.  In the evening, her daughter helps prepare dinner.  They talk together, watch some television, and both of them usually go to bed around 8:30 p.m.  (A.R. 263-64)

Mitchell estimated she can only lift about ten pounds; stand for about ten minutes at a time and walk no more than 100 yards

before she has to sit down and rest for a few minutes; and sit for no more than 30 minutes at a time before she has to change positions.  She is unable to squat or kneel, reach outward and upward with her arms, or climb stairs without the assistance of a handrail.  She has difficulty concentrating, completing tasks, and understanding what people say to her.  (A.R. 266)  She has to read written instructions several times to comprehend them, but then cannot retain what she has read.  (A.R. 261)

According to Mitchell, her doctors have prescribed hand braces that she wears "almost full time day [and] night."  (A.R. 262)  She also wears prescription glasses.  (*Id.*)

Mitchell also completed a Pain & Fatigue Questionnaire.  (A.R. 267-72)  She described eleven different types of pain she experiences from her various conditions: (1) constant, aching pain in her joints due to inflammatory arthritis; (2) constant, deep aching and weakness in her muscles and limbs due to fibromyalgia; (3) "severe throbbing and vice-gripping pain from [her] migraine headaches," occurring as often as four times a month; (4) tingling, stinging pain and numbness in her fingers and toes from Raynaud's disease, worsened by using her hands, wrists, and feet; (5) painful burning and itching from hives and a rash on her face, arms, fingers, chest, thighs, buttocks, lower leg, and feet; (6) cramping in her bowels and abdomen, and burning in her urinary tract, as side effects of her medications; (7) "all over ache from Depression"; (8) soreness in her throat and pressure in her lymph nodes and glands that occurs "periodically during the month"; (9) "a gripping ache" associated with her heart palpitations, which occur "in spurts," usually several days in a row; (10) stiffness and soreness

29 - FINDINGS & RECOMMENDATION

1 when she awakens every morning; and (11) tenderness to touch due to
2 skin sensitivity.  (A.R. 268-70)

3    Mitchell also described how she is affected by fatigue on a
4 daily basis.  She takes frequent breaks to rest throughout the day,
5 and usually naps during the day.  Her mental fatigue affects the
6 way she interacts with others, including her daughter, and affects
7 her ability to concentrate for any period of time.  (A.R. 271-72)

8

9                     *C.   Third-Party Testimony*
10 *1.   Sharon Mitchell's statement*

11    Mitchell's mother, Sharon Mitchell, stated it has been very
12 difficult for her to observe the progress of her daughter's ill-
13 ness.  She has watched Mitchell go from "a vibrant, and lively, and
14 happy woman . . . into this woman who can hardly function."  (A.R.
15 305)  She stated Mitchell began having migraine headaches in the
16 fall of 2005.  According to Sharon, the migraines occur frequently
17 and cause Mitchell to "become[] very disabled."  (*Id.*)  According
18 to Sharon, Mitchell's "adrenal glands [have] totally shut down."
19 (*Id.*)  She stated Mitchell "fights fatigue every day."  (*Id.*)

20    Sharon opined that if Mitchell only had to deal with migraines
21 and fatigue, "she might have been able to cope and keep working,"
22 but Mitchell began to experience debilitating pain throughout her
23 body.  Sharon was with Mitchell when her daughter received the
24 diagnoses of lupus erythematosus, Raynaud's disease, and "systemic
25 sclerosis."  (*Id.*)  She stated the doctor gave them written
26 information on systemic sclerosis that indicated only 65% of
27 sufferers live another five years.  Mitchell received this
28 diagnosis in the fall of 2006.  (*Id.*)

30 - FINDINGS & RECOMMENDATION

1  Sharon has observed Mitchell's hands and feet become swollen
2  and hot, and she goes to Mitchell's home to assist her very
3  frequently because Mitchell is in too much pain to function.
4  Sharon stated, "I go to her house and find her deeply depressed and
5  groaning in pain until the next pill takes over.  When the pills
6  take over, she is a mere shadow of who she use[d] to be.  Her mind
7  becomes so fogged up."  (*Id.*)  Sharon stated she had to start
8  taking antidepressants herself because she became so depressed
9  watching her daughter deteriorate.  She stated Mitchell's per-
10 sonality has changed drastically due to her illness and the medica-
11 tions she takes.  In Sharon's opinion, there is no way Mitchell
12 would be able to work.  (A.R. 307)

13

14 *2.  Tefna Mitchell's statement*

15 Mitchell's daughter, Tefna, indicated her mother first became
16 ill when Tefna was eleven years old.  Tefna stated she helps
17 Mitchell "with everything," and Tefna does most of the household
18 chores because her mother is too tired to do them.  It used to take
19 her mother half an hour to get ready to go somewhere, but now it
20 takes "a couple of hours."  (A.R. 309)  Tefna is glad she is around
21 to help her mother, but she also expressed frustration, feeling she
22 is missing a big part of her childhood because she has had to take
23 on so many responsibilities.  (A.R. 309-10)

24

25 **D.  *Medical Expert's Testimony***

26 Internal Medicine specialist Gerald Weingarten, M.D. testified
27 as a Medical Expert ("ME").  He reviewed all of Mitchell's medical
28 records that are part of the administrative file, and he listened

31 - FINDINGS & RECOMMENDATION

1 to Mitchell's testimony at the hearing.  Dr. Weingarten described

2 Mitchell's various diagnoses as follows:

> According to the records, she was being
> treated for mixed connective tissue disorder,
> and it wasn't really clear, though.  At one
> point it says crossover between lupus and
> systemic sclerosis.  Another place it said
> lupus and polymyositis.  She has migraine
> headaches.  She has probably muscle contrac-
> tion headaches, also a diagnosis of daily
> headaches.  At one point back in 2006 she was
> diagnosed with carpal tunnel syndrome, but
> then again in March 11 of 2009 she had normal
> nerve conduction[] studies not indicating any
> evidence of carpal tunnel syndrome. . . .  She
> has a diagnosis of Raynaud's disease or
> phenomen[on], part of her connective tissue
> disorder.  She has, you know, been seeing
> various doctors, chiropractors, orthopedic
> surgeon consultation . . ., rheumatology, her
> regular doctor.  There isn't too much in the
> record to tell me how they diagnosed mixed
> connective tissue disorder, though, because
> her EMG's were normal.  She had completely
> normal sed rate in 2009. . . .  There is
> mention of depression getting worse . . ., and
> then she has a diagnosis of fibromyalgia.  A
> lot of doctors were concerned as to why she
> wasn't getting better, and maybe she was on
> too many medications, that she doesn't really
> need steroids.  She was on a low dose of
> steroids because it didn't really seem to be
> doing anything.

19 (A.R. 48-49)

20    Dr. Weingarten stated his opinion that Mitchell's medical

21 records support diagnoses of fibromyalgia, migraine headaches,

22 "muscle contraction" headaches, chronic daily headaches, "and some

23 cognitive effect of [the] multiple medications she's taking."

24 (A.R. 49-50)  He opined Mitchell would be able to lift/carry up to

25 10 pounds frequently and 20 pounds occasionally; stand/walk, and

26 sit, for about six hours each in an eight-hour workday; and push/

27 pull without limitation.  She could perform all types of postural

28 activities occasionally, but should not climb ladders, ropes, and

32 - FINDINGS & RECOMMENDATION

scaffolds.   She would have no manipulative limitations at all, "based upon the fact that there's no objective evidence that she had carpal tunnel syndrome[.]"   (A.R. 51)   She should avoid concentrated exposure to extreme cold, hazards, machinery, and heights.  (*Id.*)

Dr. Weingarten indicated that if Mitchell is still taking narcotic pain medications, "that could affect her cognitively, so she might be drowsy," and her "thinking processes" could be affected.  (A.R. 54-55)  He stated Mitchell "obviously" has a flat affect, and he recommended Mitchell be evaluated by a psychologist to determine whether depression would affect her functional abilities.   (A.R. 55)   He indicated that Mitchell's testimony regarding her limitations was "reasonably consistent" with the diagnoses he found to be supported by the medical records.  (*Id.*)

### E.  *Vocational Expert's Testimony*

The VE classified Mitchell's work history as follows:

> First job is sales attendant, . . . SVP2, light work, and it's light as described by [Mitchell]; sales rep, food products; . . . SVP 5; it's considered light work, and it's light as described by [Mitchell]; luggage checker, . . . SVP 3; medium level work, and heavy as described by [Mitchell]; house worker, . . . it's an SVP 2; it's medium level work per DOT, and as performed by [Mitchell] it was heavy; ticket seller, . . . it's an SVP 2; light per DOT, and light according to [Mitchell]; clerical worker, . . . it'[s] an SVP 4; the DOT describes it as light, and [Mitchell] has worked in these jobs that required from light to medium level of activity; waitress, . . . SVP 3; it's light according to DOT, and [Mitchell] worked at this job at a medium capacity; inventory clerk, . . . it's an SVP 5; light work according to DOT and according to [Mitchell]; and file clerk II, . . . it's an SVP 3; it's

1                   light   work,   and   it's   light   according   to
                    [Mitchell].
2

3   (A.R. 69-70[9])  After lengthy discussion between the ALJ and the VE,

4   the ALJ determined that Mitchell's past relevant work was limited

5   to "sales rep for food products, the luggage checker, and the

6   clerical worker[.]"  (A.R. 78)

7        The ALJ asked the VE to consider a hypothetical individual of

8   Mitchell's age, and with her level of education and past relevant

9   work.   The   individual   would   have   the   following   functional

10  limitations:

11                  Let's assume that . . . this person can lift
                    20 pounds occasionally and 10 pounds fre-
12                  quently.  Let's assume that this person can
                    stand and walk for six hours as well as sit
13                  for six hours in the course of a standard
                    eight hour work shift.  That would factor in
14                  typical breaks, such as lunch break, a morning
                    and an afternoon break; I will incorporate the
15                  medical expert's postural limitations.  Let's
                    assume that this person can occasionally climb
16                  stairs   and   ramps,   [but]   should   not   climb
                    ropes, ladders or scaffolds.  Let's assume
17                  that this person can occasionally balance,
                    stoop, kneel, crouch, and crawl.  Let's assume
18                  that this person should have no exposure to
                    cold, no exposure to workplace hazards such as
19                  unprotected heights, or moving or dangerous
                    machinery.
20

21

22       [9]Jobs are classified with an "SVP," or level of "specific

23  vocational preparation" required to perform the job, according to
    the *Dictionary of Occupational Titles*.  The SVP "is defined as the
24  amount of lapsed time required by a typical worker to learn the
    techniques, acquire the information, and develop the facility
25  needed for average performance in a specific job-worker situation."
    *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or. Dec.
26  7, 2011) (Simon, J.) (citation omitted).  "The DOT identifies jobs
    with an SVP level of 1 or 2 as unskilled, jobs with an SVP of 3 or
27  4 as semi-skilled, and jobs with an SVP of 5 or higher as skilled."
    *Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or Mar. 1,
28  2012) (Brown, J.) (citing SSR 00-4p).

    34 - FINDINGS & RECOMMENDATION

1  (A.R. 79)   The ALJ asked if this hypothetical individual could

2  perform any of Mitchell's past relevant work of "sales rep food

3  products, luggage checker, or clerical worker." (A.R. 79-80)  The

4  VE indicated the individual would be able to perform the job of

5  sales rep for food products, and one of Mitchell's past clerical

6  jobs, which she described as light work.  The clerical job Mitchell

7  described as medium work would be excluded, as would the luggage

8  checker.  (A.R. 80)

9      If the individual were limited to frequent handling and

10 fingering, there would be no impact on the jobs she could perform;

11 she still could perform the light clerical job and the sales rep

12 job.  (*Id.*)  However, if the individual were limited to occasional

13 handling and fingering, both of those jobs would be eliminated.

14 (A.R. 81)

15     Returning to the initial hypothetical, if that individual were

16 limited to unskilled work, defined as "routine, repetitive tasks

17 with simple instructions," that limitation also would eliminate

18 both the light clerical job and the sales rep job, which are semi-

19 skilled jobs.  (*Id.*)  However, this individual would be able to

20 work as a marking clerk, a bonder, and an electronics worker, all

21 of which are light jobs with an SVP of 2.   (A.R. 82)   If this

22 particular individual would have to change positions for a minute

23 or two every fifteen minutes, and also would be limited to frequent

24 handling and fingering, the individual could still perform the

25 marking clerk, bonder, and electronic worker jobs.  (A.R. 82-83)

26     If the individual's handling and fingering were limited to

27 occasional, rather than frequent, then all three of those jobs

28 would be eliminated.   The VE indicated that whenever an indi-

35 - FINDINGS & RECOMMENDATION

vidual's handling and fingering ability drops to occasional, employment options become limited.  The VE stated such an individual would be able to work as a "[b]lending tank helper," a light job with an SVP of 2.  "This is a job in a juicing factory, where it's basically holding lids and observing juice being poured in for mixing, et cetera." (A.R. 83-84)  The individual also could work as an "investigator/dealer accounts," a light job with an SVP of 2.  "This position is working for a bank or a lender, and goes out to make sure inventory secured by loans is present in the . . , [b]usiness." (A.R. 84)  The individual also could work as a counter clerk in the photo finishing business, light work, with an SVP of 2. (*Id.*)

The ALJ next asked the VE to consider "a completely new" hypothetical individual who "can stand no more than 10 minutes, and then on some days would be too weak to stand; . . . needed a cane to ambulate from place to place; . . . could sit no more than 15 to 30 minutes at a time, before needing to change position; . . . must take naps three to four times per day, . . . of at least a half hour per nap; . . . ability to lift would be limited to no more than 10 pounds; and . . . essentially lacked any ability to use her hands for grasping or for fine manipulation, at even the occasional level through the day[.]"  (A.R. 84-85; citations to exhibits omitted)  The VE indicated "the requirement of naps three to four times [per day] would eliminate employment." (A.R. 85)  Even without that limitation, the VE stated this individual would only be able to work at sedentary jobs, and the lack of any ability to grasp and perform fine manipulations would be "very debilitating." (*Id.*)

36 - FINDINGS & RECOMMENDATION

Mitchell's attorney asked the VE to return to the ALJ's first hypothetical, and add that due to mental confusion, the individual would be unable to maintain attention to tasks on an occasional basis, which means up to 30% of the time.  The VE stated such an individual would be unable to work at any job.  This would be true whether the individual's mental confusion arose from fatigue, from migraine headaches, or from medications the individual was taking. (A.R. 90-92)

### III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.   Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

1 *Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094,
2 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d
3 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f)
4 and 416.920 (b)-(f)).  The claimant bears the burden of proof for
5 the first four steps in the process.  If the claimant fails to meet
6 the burden at any of those four steps, then the claimant is not
7 disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*,
8 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119
9 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth
10 general standards for evaluating disability), 404.1566 and 416.966
11 (describing "work which exists in the national economy"), and
12 416.960(c) (discussing how a claimant's vocational background
13 figures into the disability determination).

14    The Commissioner bears the burden of proof at step five of the
15 process, where the Commissioner must show the claimant can perform
16 other work that exists in significant numbers in the national
17 economy, "taking into consideration the claimant's residual
18 functional capacity, age, education, and work experience." *Tackett*
19 *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner
20 fails meet this burden, then the claimant is disabled, but if the
21 Commissioner proves the claimant is able to perform other work
22 which exists in the national economy, then the claimant is not
23 disabled.  *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.
24 §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

25    The ALJ also determines the credibility of the claimant's
26 testimony regarding his or her symptoms:

27             In deciding whether to admit a claimant's
             subjective symptom testimony, the ALJ must
28             engage in a two-step analysis.  *Smolen v.*

38 - FINDINGS & RECOMMENDATION

> *Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
> Under the first step prescribed by *Smolen*,
> . . . the claimant must produce objective
> medical evidence of underlying "impairment,"
> and must show that the impairment, or a combi-
> nation of impairments, "could reasonably be
> expected to produce pain or other symptoms."
> *Id.* at 1281-82. If this . . . test is satis-
> fied, and if the ALJ's credibility analysis of
> the claimant's testimony shows no malingering,
> then the ALJ may reject the claimant's testi-
> mony about severity of symptoms [only] with
> "specific findings stating clear and con-
> vincing reasons for doing so." *Id.* at 1284.

*Batson v. Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2004).

### B.   The ALJ's Decision

The ALJ found Mitchell has not engaged in substantial gainful activity since her alleged onset date of September 2, 2008.  He found Mitchell has severe impairments consisting of "mixed connective tissue disorder, chronic tension headaches and rare breakthrough migraine type headaches, and fibromyalgia." (A.R. 12) The ALJ noted, "There is general agreement that [Mitchell] has some form of mixed connective tissue disease characterized at various times by symptoms of Reynaud's [sic] syndrome . . . although that appears to have abated as time progressed, . . . Sjogren's syndrome . . ., scleroderma and lupus." (*Id.*)

The ALJ found Mitchell's mild degenerative changes of her lumbar spine and SI joint, and osteopenia, are not severe impair-ments because they do not cause Mitchell any limitations in her ability to perform basic work activities.  (A.R. 13)

The ALJ found Mitchell has a medically-determinable impairment of depression, but he concluded the impairment is not severe.  He found Mitchell's depression causes her only mild limitations in her

activities of daily living, social functioning, and cognitive difficulties. (*Id.*)  He noted there are no counseling records in the file, and Dr. Anderson, whose opinion the ALJ gave great weight, concluded Mitchell did not have any severe mental impairments.  (A.R. 14)

Despite finding Mitchell has severe impairments, the ALJ concluded none of them, singly or in combination, meets the listing level of severity.  (A.R. 14)  He concluded Mitchell has the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk, and sit, for about six hours each in an eight-hour workday; "occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl"; but "never climb ladders, ropes or scaffolds," and she must avoid exposure to cold, unprotected heights, and dangerous machinery.  (A.R. 15)

The ALJ found Mitchell's allegations regarding the intensity, persistence, and limiting effects of her impairments are not fully credible.  He noted Mitchell's headaches had improved significantly on anti-migraine medication, and "[i]n any event, her headaches appear to be mostly mild and rarely severe . . . and mostly responsive to over the counter medication, except for once or twice a month."  (A.R. 16; citations to exhibits omitted)

The ALJ noted that although Mitchell's fibromyalgia "may have possibly been disabling in the past when untreated . . ., it has responded to medication and [Mitchell] has done better with treatment. . . .  There is no evidence that she has told her doctors that she needs to nap several times per day, from 1-3 hours each nap."  (*Id.*)

Regarding Mitchell's mixed connective tissue disorder, the ALJ found as follows:

> [T]his diagnosis encompasses the variety of diagnoses that [Mitchell] has had over time, such as Reynaud's [sic] syndrome, Sjogren's syndrome, scleroderma, lupus and other associated conditions. [Mitchell's] Reynaud's [sic] disease has abated over time with treatment, and her doctor noted it was "clearly better[.]" . . . In terms of etiology for her symptoms, medical testing ruled out myopathy and neuropathy affecting her hands . . ., there is no evidence of synovitis affecting her hands . . ., and no evidence of inflammatory arthritis affecting any part of her body. . . . Test results and clinical findings have ruled out polymyositis . . . and she had essentially normal range of motion of the cervical spine, shoulders, thoracic spine, hips, knees, and ankles. . . . There is no evidence of any neurologic disease such as myopathy, peripheral neuropathy, or myelopathy. . . .
>
> There is general agreement that her primary problem is pain. She has reported diffuse body pain, consisting of 4 types: muscle pain, muscle aching and weakness, joint pain and headaches. . . . Her most prominent symptom is pain, with no clear etiology . . ., and most [of] her pain is from fibromyalgia. . . . She reported that she gets good pain relief on hydrocodone, and it helped her headaches as well as her joint and muscular pain. . . . Vicodin gave her relief and improved her functional status. . . . [Mitchell] stated that acupuncture made her feel better, although it did not help her headaches. . . . She reported that chiropractic care that is associated with massage . . . makes her feel much better. . . . The bottom line is that she typically gets good pain relief with medication. . . . To the extent her typical experience varies from this normal response, a light residual functional capacity accommodates her pain.

(*Id.*) The ALJ noted Mitchell's long-term pain also "has clearly resulted in significant deconditioning over time." (*Id.*)

41 - FINDINGS & RECOMMENDATION

Regarding Mitchell's cognitive difficulties from her medications, the ALJ found the evidence to be conflicting. On examination by Drs. Fan and Griffin, she did not evidence any particular problems with cognitive functioning. The ALJ noted Dr. Griffin had opined Mitchell's "slowed cognitive function was probably a function of her medication, specifically vicodin[.]" (*Id.*)

The ALJ further found the record evidence does not support Mitchell's claim that she is limited significantly. He noted Mitchell claimed "she had some thigh weakness when hiking or walking for prolonged periods," but she "was able to walk for at least 6 minutes for a pulmonary function test[.]" (A.R. 17; citations to exhibits omitted) Mitchell's pain improved with horseback riding, and one of her doctors had recommended she "do more walking and horseback riding, to build up her strength and endurance. . . . Another recommended she engage in aerobic activity[, and] Dr. Griffin recommended that [she] spend 1-2 hours per week volunteering her time, to get her mind off her health problems[.]" (*Id.*) The ALJ noted that although Mitchell needs assistance with basic activities of daily living at times, "at other times she is able to do these herself," including sometimes doing dishes and laundry, and walking on a treadmill. (*Id.*)

The ALJ gave little weight to Dr. Raklyar's February 2009 opinion that Mitchell was temporarily disabled, and needed to initiate treatment for fibromyalgia. The ALJ noted "Dr. Raklyar did not explain her opinion, and she did not opine the length of time that [Mitchell] would be disabled, . . . note any functional limitations, . . . [or] cite any objective medical evidence." (*Id.*)

42 - FINDINGS & RECOMMENDATION

1    The ALJ gave great weight to the opinions of the DDS
2  consulting physician and ME Dr. Weingarten regarding Mitchell's
3  functional capacity.  He noted, "Dr. Weingarten is the only medical
4  expert to have the benefit of both the entire medical record and
5  [Mitchell's] testimony, and his opinion is consistent with the
6  medical record, which shows that [Mitchell's] symptoms [are] fairly
7  controlled with medication."  (*Id.*)

8    The ALJ found the statements from Mitchell's mother and
9  daughter "generally reflect the same allegations made by [Mitchell]
10 that she is completely disabled from all work, allegations that are
11 not entirely credible for the reasons discussed[.]"  (A.R. 18)

12    Based on the ALJ's RFC assessment and the VE's testimony, the
13 ALJ concluded Mitchell "is capable of performing past relevant work
14 as a sales representative - food products and clerical worker."
15 (*Id.*)  He therefore concluded Mitchell is not disabled.  (A.R. 20)

16

17                    **IV.   STANDARD OF REVIEW**

18    The court may set aside a denial of benefits only if the
19 Commissioner's findings are "'not supported by substantial evidence
20 or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.*
21 *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*
22 *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*
23 *v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1
24 (9th Cir. May 20, 2011).  Substantial evidence is '"more than a
25 mere scintilla but less than a preponderance; it is such relevant
26 evidence as a reasonable mind might accept as adequate to support
27 a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
28 1039 (9th Cir. 1995)).

43 - FINDINGS & RECOMMENDATION

1    The court "cannot affirm the Commissioner's decision 'simply
2 by isolating a specific quantum of supporting evidence.'" *Holohan*
3 *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*
4 *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
5 must consider the entire record, weighing both the evidence that
6 supports the Commissioner's conclusions, and the evidence that
7 detracts from those conclusions.  *Id.*  However, if the evidence as
8 a whole can support more than one rational interpretation, the
9 ALJ's decision must be upheld; the court may not substitute its
10 judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.*
11 *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

12    A similar standard applies to judicial review of the Commis-
13 sioner's decision to terminate benefits.  The court will set aside
14 a decision to terminate benefits only when the decision is "based
15 upon legal error" or is "not supported by substantial evidence in
16 the record as a whole."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th
17 Cir. 1984) (citation omitted).  "If the evidence admits of more
18 than one rational interpretation, [the court] must uphold the
19 decision of the ALJ."  *Id.* (citation omitted).

20
21                          ***V.  DISCUSSION***

22    In Mitchell's opening brief to this court, she made three
23 primary arguments: (1) the ALJ failed to consider properly the
24 effects of Mitchell's medications on her depression; (2) the ALJ
25 failed to evaluate Dr. Weingarten's testimony properly; and (3) the
26 ALJ's residual functional capacity is not supported by substantial
27 evidence because it did not include all of Mitchell's impairments.
28 Dkt. #15.  In discussing the first two issues, Mitchell's attorney

1  noted that despite inconclusive testimony from Dr. Weingarten
2  regarding the effects of Mitchell's medications on her cognitive
3  functioning and depression, the ALJ failed to do what he stated he
4  would do; i.e., either find Mitchell disabled, or refer her for a
5  psychological evaluation. *Id.*

6      After reviewing Mitchell's opening brief, the Commissioner
7  determined that the ALJ had erred in failing to obtain a psycho-
8  logical evaluation of Mitchell, and the case should be remanded so
9  a psychological evaluation can be obtained. *See* Dkt. #19, p. 2.
10 The ALJ had discussed obtaining such an evaluation with Mitchell's
11 counsel at the hearing, indicating he planned to review
12 Dr. Weingarten's testimony after the hearing, and would either find
13 Mitchell disabled or order a psychological evaluation, as appro-
14 priate. (*See* A.R. 85-90) However, the ALJ failed to order such an
15 evaluation, and in his decision, he failed to discuss the ME's
16 findings that were discussed at the ALJ hearing.  The Commissioner
17 moves for remand for purposes of obtaining a consultative
18 psychological evaluation. Dkt. #19, p. 2.

19     Mitchell agrees remand is appropriate, but argues the case
20 should be remanded for immediate payment of benefits, rather than
21 further administrative proceedings.  Alternatively, if the case is
22 remanded for further proceedings, Mitchell argues the remand order
23 should be more specific and include more requirements than the
24 Commissioner suggests.  Specifically, Mitchell maintains the only
25 appropriate medical professional who could do the necessary evalu-
26 ation would be a psychiatrist, not a psychologist, because the
27 issue concerns the particular cognitive effects and functional
28 limitations resulting from Mitchell's medications.  She further

45 - FINDINGS & RECOMMENDATION

1  argues a consulting evaluation without a further hearing would be
2  prejudicial to her, because she would not have the opportunity to
3  cross-examine the psychiatrist.  She suggests the consulting psy-
4  chiatrist should testify at a further hearing so Mitchell's counsel
5  can cross-examine the psychiatrist regarding his/her findings and
6  opinions. Dkt. #20, p. 3.

7      Mitchell argues further that having the consulting psychia-
8  trist testify at a further hearing would permit the ALJ to resolve
9  the conflict between Dr. Weingarten's testimony and the opinions of
10 the DDS consultants, again insisting that "a psychologist consul-
11 tative examination would be unable to resolve the conflict because
12 assessing the contribution from the pharmacological complications
13 is beyond the expertise and training of a psychologist." *Id.*,
14 pp. 3-4.  She also argues the ALJ's credibility findings are not
15 supported by substantial evidence. *Id.*, pp. 4-6.

16     Thus, although Mitchell would prefer a remand for immediate
17 payment of benefits, if the case is remanded for further pro-
18 ceedings she requests an order (1) requiring evaluation by a
19 psychiatrist, rather than a psychologist; (2) requiring another ALJ
20 hearing at which the psychiatrist is required to testify and submit
21 to cross-examination; and (3) allowing Mitchell to present addi-
22 tional evidence on remand to support her application for disability
23 and rebut any evidence offered by the Commissioner.  In addition,
24 Mitchell notes her application was filed over four years ago, in
25 2009.  She therefore asks the court to order that the proceedings
26 upon remand be concluded within 120 days of the court's remand
27 order, "or some appropriate date certain as set by the Court."
28 *Id.*, p. 7.

46 - FINDINGS & RECOMMENDATION

1    The court agrees with the parties that remand is appropriate
2 in this case.  The concerns raised by the ALJ at the hearing, and
3 the conflicting evidence noted by the ALJ in his decision, can only
4 be resolved by a psychological evaluation.  Further, the appropri-
5 ate consultant for purposes of resolving the issues at hand is
6 either a psychiatrist, or a psychologist with sufficient training
7 and expertise in pharmacology to evaluate the effects of Mitchell's
8 medications on her cognitive functioning and depression.    The
9 Commissioner appears to agree, indicating "the ALJ shoulder order
10 a psychological evaluation with a psychiatrist, if available[.]"
11 Dkt. #19, p. 9.  (If a psychiatrist is not the expert used, then
12 the Commissioner should be required to make a showing that no
13 psychiatrist was available.)

14    The court agrees with Mitchell that it would be appropriate
15 for the expert performing the psychological evaluation to testify
16 at a further ALJ hearing, allowing Mitchell the opportunity to
17 cross-examine the expert regarding his/her findings, if desired,
18 and the ALJ the opportunity to resolve any conflicting testimony.

19    Regarding Mitchell's suggestion that she will be prejudiced if
20 she is not allowed to submit additional evidence in support of her
21 application, the law provides that the court "may at any time order
22 additional evidence to be taken before the Commissioner of Social
23 Security, *but only upon a showing that there is new evidence which
24 is material and that there is good cause for the failure to incor-
25 porate such evidence into the record in a prior proceeding*[.]"  42
26 U.S.C. § 405(g).  Mitchell has not described any new evidence she
27 proposes to offer upon remand, nor has she explained why any such
28 evidence was not available for production in the prior proceeding.

1  Thus, the court denies Mitchell's request for an order directing
2  the Commissioner to allow Mitchell to offer new evidence.  Never-
3  theless, if appropriate, Mitchell certainly could submit evidence
4  in response to or rebuttal of the additional evidence offered by
5  the Commissioner.

6       Finally, the court agrees with Mitchell that a reasonable time
7  limit should be imposed for completion of the proceedings upon
8  remand, although the undersigned believes 120 days is insufficient
9  time limit.  The undersigned believes a time limit of 180 days
10 would be appropriate.

11

12                    *VI.  CONCLUSION*

13      For the reasons discuss above, the undersigned recommends the
14 Commissioner's motion for remand be granted, and upon remand, the
15 Commissioner be ordered to do the following:

16      (1)  Obtain a psychological evaluation of Mitchell with a
17           psychiatrist, if available (or an adequate showing as to
18           why no psychiatrist was available), or a psychologist
19           with adequate training and experience in pharmacology to
20           evaluate the effects of Mitchell's medications on her
21           cognitive abilities and depression;

22      (2)  Hold a further ALJ hearing at which the evaluating psy-
23           chiatrist/psychologist testifies and is available for
24           cross-examination by Mitchell's counsel, if desired; and

25      (3)  Complete the proceedings upon remand and issue a decision
26           within six months from the date of the court's remand
27           order.

28

1

***VII.  SCHEDULING ORDER***

2    These Findings and Recommendations will be referred to a

3 district judge.  Objections, if any, are due by **March 10, 2014.**  If

4 no objections are filed, then the Findings and Recommendations will

5 go under advisement on that date.  If objections are filed, then

6 any response is due by **March 27, 2014.**  By the earlier of the

7 response due date or the date a response is filed, the Findings and

8 Recommendations will go under advisement.

9    IT IS SO ORDERED.

10                              Dated this <u>19th</u> day of February, 2014.

11

12                              /s/ Dennis J. Hubel

13                              _____

                                Dennis James Hubel
14                              Unites States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

49 - FINDINGS & RECOMMENDATION